

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JESUS RUIZ, | ) | 01 C 1191 |
| MIGUEL TORRES, and | ) | 00 C 7182 |
| JOSE DE LA PAZ SANCHEZ, | ) | 00 C 7323 |
| | ) | |
| Movants, | ) | |
| | ) | |
| v. | ) | Honorable Charles R. Norgle |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**OPINION AND ORDER**

CHARLES R. NORGLE, District Judge

Before the court are Jesus Ruiz's, Miguel Torres', and Jose De La Paz Sanchez's Motions under 28 U.S.C. § 2255 to vacate, set aside, or correct their sentences. The court considers these Motions on a consolidated basis. Movants, Jesus Ruiz ("Ruiz"), Miguel Torres ("Torres"), and Jose De La Paz Sanchez ("Sanchez"), challenge their sentences for participating in a RICO conspiracy, kidnapping, violating the Hostage Act, assaulting a federal officer, and using a firearm during a crime of violence. For the reasons stated below, the Motions are denied.

### I. BACKGROUND[1]

A. Facts

Movants Ruiz, Torres, and Sanchez, along with Salome Varela ("Varela"), all illegal aliens from Mexico, acted as enforcers for a cocaine trafficking operation located in El Paso,

---

[1] The facts of this case are recited in United States v. Torres, 191 F.3d 799 (7th Cir. 1999). The court takes additional facts from the Government's Response to Varela's Amended Motion to Vacate Sentence.

1

Texas, with its roots in Mexico. (The court will refer to these individuals collectively as "Movants"). In order to enforce the payment of drug debts, the Movants kidnapped four individuals. The Movants believed that these individuals either owed, or were related to someone who owed, money to individuals in El Paso. After kidnapping the victims, the Movants contacted the victims' families and demanded ransom. The victims were held in two separate locations in Chicago, Illinois. As will be explained in greater detail below, this scheme ultimately resulted in the murder of one victim, and ended only after a high-speed car chase during which Varela pointed a gun at a federal agent.

One of the victims, Jesus Avila ("Avila"), was abducted by Movants Ruiz, Torres, and Sanchez, and taken away by a blue and white van to a house on Newland Avenue in Chicago. During the abduction, all three Movants were armed; Torres was armed with a machine gun. Avila was bound with duct tape and handcuffed to a post in the basement of the Newland Avenue house, where the Movants beat him, and threatened his life. At one point, Ruiz pointed a gun towards Avila's head and cocked the trigger. The Movants then placed ransom calls to Avila's sister and wife, telling them that Avila would be killed and dumped into a garbage can if sufficient ransom was not paid. Avila's sister and wife then paid the Movants $10,000, and delivered three cars to the Movants. Avila ultimately was able to escape from the Newland Avenue house after fifteen days of captivity.

Two other victims, Jesus Flores ("Flores") and Rafael Martinez ("Martinez"), were also abducted into the blue and white van by the Movants, and handcuffed to basement support posts in the Newland Avenue house. Flores was abducted because his son owed drug debts. Martinez was abducted because of his own drug debts. Like Avila, both Flores and Martinez were

threatened with physical harm if the debts were not paid. The Movants made ransom calls to Flores' wife, at which time Mrs. Flores advised the Movants that Flores suffered from diabetes, and required daily medication. The Movants ignored Flores' diabetes, holding him for nine days without medication. Fortunately for Flores and Martinez, they were able to escape while being led out of the Newland Avenue house at gunpoint.

These events culminated with the kidnapping and murder of a seventeen year old high school student, Jaime Estrada ("Jamie"). The Movants abducted Jamie from Milwaukee, Wisconsin, on June 27, 1998. Jamie was held in an apartment on Moody Avenue in Chicago, blindfolded and tied to a chair. The evening of the 27th, one of the Movants called Jamie's brother Alex and indicated that if ransom was not paid, Jamie would be killed, and the Movants would cut off Jamie's ears and skin and mail them to Alex. Torres later shot Jamie in the abdomen. Jamie was then locked alone in a bathroom, bleeding and vomiting. The next morning, one of the Movants called Jamie's brother Miguel and informed Miguel that they had shot Jamie, and directed Miguel to deliver $30,000 and a car to a specific Chicago location. The Estrada family then contacted law enforcement officials.

At this point, Miguel agreed to participate in a series of recorded telephone conversations with the Movants. During these calls, Varela and another individual (the fugitive Luis Alberto Carreno) were recorded demanding ransom from Estrada's family, and issuing instructions for the delivery of the ransom. Federal Bureau of Investigation ("FBI") agents then set up a controlled ransom delivery during which FBI agents would apprehend whichever Movants appeared. Movants Varela, Ruiz, and Torres drove to the delivery site. Ruiz then attempted to gain entry to car in which the ransom had been placed. FBI agents spotted Ruiz, and moved to

apprehend him. The Movants fled, with Varela pointing a 9-millimeter Beretta pistol at an agent. The Movants then led the agents on a high-speed car chase during which the Movants ran red lights, and reached speeds of nearly 100 miles per hour on the Stevenson Expressway. After an agent rammed the Movants' car, the Movants were apprehended. (Sanchez was apprehended separately.)

The following morning, an attendant found Jamie barely alive at a used car lot on the west side of Chicago. In addition to his gunshot wound (a one and one half inch wide wound to his abdomen), Jamie had been handcuffed and beaten. After thirty days in the hospital, Jamie succumbed to his injuries. The coroner determined that Jamie died from the gunshot wound, and a thirty hour delay in receiving medical treatment.

### B. Procedural History

The grand jury returned an indictment against the Movants. A superceding eleven count indictment charged the Movants with the following offenses: conspiracy to commit racketeering, in violation of 18 U.S.C. § 1962(d); hostage taking, in violation of 18 U.S.C. §§ 1203(a), 2; conspiracy to commit kidnapping, in violation of 18 U.S.C. §§ 1201 (c), 2; kidnapping in interstate commerce, in violation of 18 U.S.C. §§ 1201(a)(1), 2; assaulting a federal agent, in violation of 18 U.S.C. § 111; and use of a firearm during a violent offense, in violation of 18 U.S.C. §§ 924 (c)(1), 2. The indictment against Sanchez included one fewer count of using a firearm during a violent offense, and did not include the charge of assaulting a federal agent.

Movants pled not guilty and requested a jury trial. At trial, the government presented evidence which "established that the defendants functioned as an informal organizational unit of a larger organization to enforce the collection of drug debts upon orders given to them by others

4

in the organization in El Paso." Torres, 191 F.3d at 807. This evidence included, *inter alia*, testimony from surviving kidnap victims indicating that they were abducted in order to obtain money from their families to settle drug debts; testimony by Sanchez indicating that the Movants had acted on the orders of associates in El Paso; and firearms, ammunition, cell phones, pagers, and other physical evidence removed from the blue van and the two "hideouts." Id. at 807-08. On October 22, 1997, the jury convicted Movants on all counts in which they were named.

The court then imposed the following sentences. Sanchez received two life sentences to be served concurrently, and a sentence of twenty-five years to be served consecutively. Varela, Ruiz, and Torres received two life sentences to be served concurrently, and a sentence of forty-five years to be served consecutively. Movants appealed their convictions and sentences to the Seventh Circuit, which affirmed. Id. at 812. Movants then petitioned the Supreme Court for a writ of certiorari; this petition was denied. Torres v. United States, 528 U.S. 1180 (2000).

Movants have timely filed their § 2255 Motions. Sanchez filed his Motion on November 16, 2000, Torres on November 13, 2000, Ruiz on February 22, 2001, and Varela on July 9, 2002.[2] On March 7, 2005, the court issued an Opinion and Order denying Varela's Motion. See Varela v. United States, 364 F. Supp. 2d 720 (N.D. Ill. 2005). After numerous court-granted continuances in the three instant cases over a period of nearly five years, Movants' court-appointed attorneys have failed to file any amended § 2255 Motions, or a Reply to the

---

[2] Varela received an extension of time in which to file his § 2255 Motion, and the government did not argue that his Motion was untimely.

Government's Consolidated Response to Defendants' § 2255 Petitions. The court therefore considers this matter to be fully briefed, and the Motions are before the court.[3]

## II. DISCUSSION

### A. Standard of Decision

Section 2255 allows a person convicted of a federal crime to vacate, set aside, or correct his sentence. This relief is available only in limited circumstances, such as where an error is jurisdictional, of Constitutional magnitude, or there has been a "complete miscarriage of justice." See Harris v. United States, 366 F.3d 593, 594 (7th Cir. 2004). This statute states:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside, or correct the sentence.

28 U.S.C. § 2255 ¶ 1. If the court determines that any of these grounds exists, it "shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255 ¶ 2. In making that determination, the court must review the evidence and draw all reasonable inferences from it in a light most favorable to the government. See United States v. Galati, 230 F.3d 254, 258 (7th Cir. 2000); Carnine v. United States, 974 F.2d 924, 928 (7th Cir. 1992).

Section 2255 petitions are subject to various bars, including that of procedural default. Section 2255 petitions are "'neither a recapitulation of nor a substitute for a direct appeal.'"

---

[3] In his § 2255 Motion, Sanchez does not advance any independent legal arguments. Sanchez merely adopts the arguments made by his co-Movants.

McCleese v. United States, 75 F. 3d 1174, 1177 (7th Cir. 1996) (citations omitted). Therefore, a § 2255 motion cannot raise: (1) issues that were raised on direct appeal, unless there is a showing of changed circumstances; (2) non-Constitutional issues that could have been raised on direct appeal, but were not; and (3) Constitutional issues that were not raised on direct appeal. See Belford v. United States, 975 F.2d 310, 313 (7th Cir. 1992) (overruled on other grounds by Castellanos v. United States, 26 F.3d 717 (7th Cir. 1994)).

There are two exceptions to the procedural default rule: (1) if the movant demonstrates cause for failing to raise the issue and actual prejudice resulting therefrom; or (2) the court's refusal to consider the Constitutional issue would result in a fundamental miscarriage of justice, which requires a showing of actual innocence. See Belford, 975 F.2d at 313 (collecting authority); see also McCleese, 75 F.3d at 1177-78 (discussing fundamental miscarriage of justice). In light of these principles, the court examines Movants' Motions.

### B. Movants' Claims for Relief under 28 U.S.C. § 2255

Movants make the following assertions in their § 2255 Motions. First, Movants argue that their indictments were constructively amended and improperly broadened, because of the government's alleged failure to specify whether Movants were charged with violations of 18 U.S.C. § 2(a) or (b), and because Count One of the indictment charged Movants in the conjunctive ("to conduct *and* participate, directly *and* indirectly, in the conduct of the affairs of the enterprise"), but at trial the government was only required to prove Movants guilty in the disjunctive (the jury instructions read "conduct *or* participate," and "directly *or* indirectly") (emphasis added). Torres Mot., at 4-7, Ruiz. Mem., at 79-84. Second, Movants assert that the district court violated the rule announced in Apprendi v. New Jersey, 530 U.S. 466 (2000), by

7

failing to require the jury to determine whether the murder was first or second degree for sentencing purposes, and because the jury was improperly not required to determine whether the Movants acted "willfully" or "knowingly" in Jamie's death. Torres Mot., at 7-9, Ruiz. Mem., at 92-95. Movants effectively admit that they failed to raise these issues at trial or on direct appeal, but they assert that this is so because their attorneys were constitutionally ineffective.[4] Torres Mot., at 9-10. Ruiz also asserts that the evidence presented against him at trial was insufficient to convict him, and that his trial attorney was constitutionally ineffective.

### 1. *Constructive Amendment of the Indictment*

Movants assert that the indictment was constructively amended, as the indictment failed to specify whether they were charged with violations of 18 U.S.C. § 2 (a) or (b). 18 U.S.C. § 2 (a) provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2 (b) provides that "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." Movants also assert that the indictment was constructively amended, as the government charged Movants in Count One in the conjunctive, but at trial was only required to prove Movants guilty in the disjunctive.

"Constructive amendment of the indictment can occur when either the government (usually during its presentation of evidence and/or its argument), the court (usually through its

---

[4] The court notes that there is no indication in the record that Movants' counsel was constitutionally ineffective either at trial or on appeal. The court would therefore be within its discretion to deem these assertions procedurally barred. See Belford, 975 F.2d at 313. The court, however, will address these allegations on their merits.

8

instructions to the jury), or both, broadens the possible bases for conviction beyond those presented by the grand jury." United States v. Alhalabi, 443 F.3d 605, 614 (7th Cir. 2006) (quoting United States v. Jones, 418 F.3d 726, 729 (7th Cir. 2005)) (internal quotation marks omitted). A constructive amendment of an indictment runs afoul of the Fifth Amendment, "which states in pertinent part that 'no person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury.'" United States v. Folks, 236 F.3d 384, 390 (7th Cir. 2001); see also Alhalabi, 443 F.3d at 614. In order to avoid violating the Fifth Amendment, "the allegations in the indictment and the proof at trial must match in order 'to insure that the defendant is not subject to a second prosecution, and to give the defendant reasonable notice so that he may prepare a defense.'" Folks, 236 F.3d at 390 (quoting United States v. McKinney, 954 F.2d 471, 480 (7th Cir. 1992)). However, the Seventh Circuit has indicated that "not every variation from the verbiage of the indictment, either in terms of proof or jury instructions, constitutes a constructive amendment." United States v. He, 245 F.3d 954, 961 (7th Cir. 2001) (quoting United States v. Baker, 227 F.3d 955, 960 (7th Cir. 2000)).

In this case, Movants' assertions that the government and/or the court constructively amended the indictment are meritless. It is established law that "[w]here the relevant statute lists alternative means of violation, the 'general rule is that when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the evidence is sufficient with respect to any of the acts charged' . . . This rule extends to a trial court's jury instructions in the disjunctive in the context of a conjunctively worded indictment." United States v. Durman, 30 F.3d 803, 810 (7th Cir. 1994) (quoting United States v. Cusumano, 943 F.2d 305, 311 (3rd Cir. 1991)) (internal citations omitted); see also Jones, 418 F.3d at 730;

United States v. Bond, 231 F.3d 1075, 1078 (7th Cir. 2000). Movants have failed to point to anything in the indictment, the evidence presented at trial, or the jury instructions given by the court, that impermissibly "broadens the possible bases for conviction beyond those presented by the grand jury." See United States v. Cusimano, 148 F.3d 824, 829 (7th Cir. 1998). Movants' assertions regarding the constructive amendment of their indictments therefore fail.

## 2. *Apprendi* Claim

Movants next assert that because the jury was not instructed to consider whether Jamie's killing was either first or second degree murder under Illinois law, and because the jury was not instructed that felony murder under Illinois law contains elements of willfulness or intent, they were unconstitutionally subjected to an increase in the prescribed statutory penalty, in violation of the rule explained in Apprendi, 530 U.S. at 466, and United States v. Booker, 543 U.S. 220 (2005). The court first notes that Movants' interpretation of Illinois law is incorrect. One of the predicate State counts underlying the racketeering charge in this case is indeed felony murder. However, under Illinois statutory law, there is no requirement that a killing that takes place in the course of a felony be intentional or willful. 720 ILL. COMP. STAT. 5/9-1 ("A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death . . . he is attempting or committing a forcible felony . . . ."); People v. Boand, 838 N.E.2d 367, 400 (Ill. App. Ct. 2005) ("Felony murder derives its mental state from the underlying intended offense. Felony murder seeks to deter persons from committing forcible felonies by holding them responsible for murder if a death results. A defendant may be found guilty of felony murder regardless of a lack of intent to commit murder.").

10

The court, however, will go no further in analyzing the merits of Movants' Apprendi claim, as the court finds that this claim is procedurally barred due to its untimeliness. Movants' convictions became final on February 22, 2000, the date the Supreme Court denied their petitions for writ of certiorari. The Seventh Circuit has held that Apprendi "does not disturb sentences that became final before June 26, 2000, the date of its release." United States v. Curtis, 294 F.3d 841, 844 (7th Cir. 2002); see also Lambert v. McBride, 365 F.3d 557, 562 (7th Cir. 2004). The Seventh Circuit has also held that Booker "does not apply retroactively to criminal cases that became final before its release on January 12, 2005." McReynolds v. United States, 397 F.3d 479, 481 (7th Cir. 2005); see also United States v. Paladino, 401 F.3d 471, 481 (7th Cir. 2005). Movants' Apprendi claims are therefore procedurally barred under the rules laid down in Curtis, 294 F.3d at 841, and McReynolds, 397 F.3d at 497.

### 3. Ruiz's Additional Claims for Relief under § 2255

#### a. insufficiency of the evidence

Ruiz first asserts that the evidence presented against him at trial is as a general matter insufficient as to all counts. Ruiz Mem., at 4-30. The court first notes that Movants asserted on direct appeal that there was insufficient evidence to convict as to the RICO count, and the Seventh Circuit soundly rejected this argument. "Our review clearly shows that the government presented sufficient facts to support the jury's findings of the existence of a pattern of racketeering." Torres, 191 F.3d at 808. On direct appeal, Movants failed to present this broader assertion that the evidence was insufficient to convict as to all counts. The court would be within its discretion to find this claim procedurally barred. See Belford, 975 F.2d at 313. In addition, this assertion is patently without merit. At trial, the government presented, *inter alia*, the

following evidence: kidnap victims' testimony regarding their ordeals, Sanchez's testimony that the Movants acted on orders from associates in El Paso, and physical evidence, including guns, cell phones, pagers, and ammunition. The Seventh Circuit found that this evidence indicated that the Movants "were a well-equipped, sophisticated group engaged in criminal activities." Torres, 191 F.3d at 807. Ruiz has provided the court with no reason to disturb that finding as to the RICO count, or to determine that the evidence presented at trial was insufficient as to any other count in the indictment. Ruiz's assertion that the evidence was insufficient to convict therefore fails.

### *b. ineffective assistance of counsel*

Ruiz makes three assertions in support of his claim of ineffective assistance of counsel. First, Ruiz claims that his attorney should have obtained forensic experts in "voiceprint individualization," Ruiz Mem., at 38, "handwriting analysis," id. at 40, and "latent fingerprints." Id. at 42. Ruiz also asserts that his attorney should have presented newspaper articles and other evidence purporting to expose "forensic deceptions" and "evidentiary frauds" allegedly perpetrated by the FBI crime lab. Id. at 46. Finally, Ruiz asserts that his attorneys should have investigated and interviewed numerous "known or potential witnesses" in preparation for trial. Id. at 53.

In order to establish that his trial counsel was ineffective, Ruiz must "show that [his] counsel's performance was deficient, and that the deficiency prejudiced [his] defense." See Wiggins v. Smith, 539 U.S. 510, 521 (2003) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). An attorney's performance is deficient if it falls "below an objective standard of reasonableness." Wiggins, 539 U.S. at 521 (quoting Strickland, 466 U.S. at 688). Prejudice is

12

established by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Benefiel v. Davis, 357 F.3d 655, 662 (7th Cir. 2004) (quoting Strickland, 466 U.S. at 694).

When a court reviews an ineffective assistance of counsel claim, the court's review is "highly deferential" to the attorney, "with the underlying assumption that 'counsel's conduct falls within the wide range of reasonable professional assistance.'" United States v. Holman, 314 F.3d 837, 840 (7th Cir. 2002) (quoting Strickland, 466 U.S. at 689). There is therefore a strong presumption that Ruiz's counsel at trial performed reasonably. See Strickland, 466 U.S. at 690; see also Cooper v. United States, 378 F.3d 638, 641 (7th Cir. 2004). To succeed in his claim, Ruiz must show "errors so serious that counsel was not functioning as the 'counsel' guaranteed [to him] by the Sixth Amendment . . . ." See Holman, 314 F.3d at 839 (quoting Strickland, 466 U.S. at 687).

Ruiz speculates that had his attorney consulted with and called to the stand various experts in voiceprint identification and handwriting and fingerprint analysis, the results of his trial would have been different. These unsupported speculations, without significantly more detail as to the nature of what this expert testimony would have revealed, are insufficient to establish that Ruiz's counsel was constitutionally ineffective. "A defendant's speculation about what evidence might have been found is insufficient to establish prejudice - [the defendant] must show what the evidence would have been and how it would have produced a different result." United States v. Traeger, 289 F.3d 461, 472 (7th Cir. 2002) (citing United States v. Shetterly, 971 F.2d 67, 75 (7th Cir. 1992)).

Embedded within Ruiz's ineffective assistance of counsel claim is the further speculation that a latent fingerprint of Ruiz's found on a piece of duct tape used to bind one of the victim's hands "was an orchestration, forensic evidence manufactured by the now infamous agents within the FBI Crime Laboratory." Ruiz Mem., at 42. Ruiz, however, provides no evidence to support his remarkable claim that FBI agents manufactured false evidence against him. See Traeger, 289 F.3d at 742.

The court acknowledges that in rare cases, an attorney's failure to investigate, call certain witnesses, or present certain evidence, can constitute ineffective assistance of counsel. See Hampton v. Leibach, 347 F.3d 219 (7th Cir. 2003); Sullivan v. Fairman, 819 F. 2d 1382, 1390 (7th Cir. 1987). However, counsel's decision not to consult or call various expert witnesses, or present evidence such as newspaper or magazine articles, can be construed as strategic decisions. The court is reluctant to engage in second guessing, or "Monday morning quarterbacking," regarding counsel's strategic decisions in this case, especially counsel's decision not to attempt to introduce various newspaper or magazine articles related to the FBI crime lab. See Harris v. Reed, 894 F.2d 871, 877 (7th Cir. 1990).

Counsel's decision not to investigate or call any of the approximately one dozen other witnesses Ruiz speculates might have exculpated him can likewise be viewed as a strategic decision not subject to the court's review. Ruiz spends considerable time speculating as to what various potential witnesses might have testified to at trial, had counsel properly investigated or called these witnesses. Ruiz Mem., at 53-76. The court acknowledges that defense attorneys have an obligation to investigate potentially exculpatory witnesses. "'It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues

14

leading to facts relevant to the merits of the case and the penalty in the event of conviction.'" Rompilla v. Beard, 125 S. Ct. 2456, 2466 (2005) (quoting 1 ABA Standards for Criminal Justice 4-4.1). However, "'a petitioner alleging that counsel's ineffectiveness was centered on a supposed failure to investigate has the burden of providing the court sufficiently precise information, that is, a comprehensive showing as to what the investigation would have produced.'" Hardamon v. United States, 319 F.3d 943, 951 (7th Cir. 2003) (quoting Simmons v. Gramley, 915 F. 2d 1128, 1133 (7th Cir. 1990)). Here, Ruiz fails to meet this burden. Ruiz offers only rampant, unsupported speculation as to what numerous potential witnesses would have testified to, e.g., Ruiz Mem., at 57-58, and additional unsupported speculation as to the alleged criminal activities of Flores, Ruiz Mem., at 60, and other witnesses.

Ruiz has failed to demonstrate that his counsel's performance was objectively deficient. See Strickland, 466 U.S. at 688. Moreover, given the overwhelming evidence presented to the jury at trial, see Torres, 191 F.3d at 807-08, there is no probability that any alleged deficiencies in counsel's performance could have prejudiced Ruiz. See Strickland, 466 U.S. at 694. Ruiz's assertion that his attorney was constitutionally ineffective therefore fails.

### III. CONCLUSION

For the foregoing reasons, Movants' motions to vacate, set aside, or correct their sentences brought pursuant to 28 U.S.C. § 2255 are denied.

IT IS SO ORDERED.

ENTER:

*[signature]*

CHARLES RONALD NORGLE, Judge
United States District Court

Dated: August 30, 2006

15